IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

HORMEL FOODS CORPORATION,

        Plaintiff,

vs.

CRYSTAL DISTRIBUTION
SERVICES, INC.,

        Defendant.

No. C09-2011

RULING ON MOTIONS *IN LIMINE*

---

**TABLE OF CONTENTS**

*I.*    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.*   *PROCEDURAL HISTORY* . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.*  *HORMEL'S MOTIONS IN LIMINE* . . . . . . . . . . . . . . . . . . . 3
    *A.*    *Salvage Evidence* . . . . . . . . . . . . . . . . . . . . . . 3
    *B.*    *Raymond Tarnowski* . . . . . . . . . . . . . . . . . . . . 6
    *C.*    *Warehouse Receipts* . . . . . . . . . . . . . . . . . . . 9
    *D.*    *Insurance Provisions* . . . . . . . . . . . . . . . . . . 13

*IV.*  *CRYSTAL'S MOTIONS IN LIMINE* . . . . . . . . . . . . . . . . . . . 15
    *A.*    *Damages Paid By Hormel's Insurers* . . . . . . . . . . . . 15
    *B.*    *Crystal's Prior Payments to Hormel* . . . . . . . . . . . 23
    *C.*    *Failing to Obtain "All Risk" Insurance* . . . . . . . . . . 25
    *D.*    *Using the Term "Basement"* . . . . . . . . . . . . . . . 26
    *E.*    *Special Valuation Clause* . . . . . . . . . . . . . . . . 26
    *F.*    *Opinions of Kathleen Kotula* . . . . . . . . . . . . . . 27
    *G.*    *Lost Profits* . . . . . . . . . . . . . . . . . . . . . . 28
    *H.*    *Articles Authored By Crystal's Attorney* . . . . . . . . . 29
    *I.*    *Insurers' Right to Subrogation* . . . . . . . . . . . . . 30
    *J.*    *Alleged Temperature Abuse* . . . . . . . . . . . . . . . 30

*V.*    *ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# I. INTRODUCTION

On the 23rd day of March 2012, this matter came on for hearing on the Motions *in Limine* filed by the Plaintiff (docket numbers 78, 79, 80, and 87) on March 9, 2012, and the Motions *in Limine* filed by the Defendant (docket numbers 82, 83, 84, 85, 86, 88, 89, 90, 91, and 92) on the same date. Plaintiff Hormel Foods Corporation ("Hormel") was represented by its attorneys, Jacob D. Bylund and Ryan P. Howell. Defendant Crystal Distribution Services, Inc. ("Crystal") was represented by its attorneys, John F. Horvath and Brian J. Fagan.

# II. PROCEDURAL HISTORY

On February 23, 2009, Hormel filed a complaint seeking judgment against Crystal for damages sustained to products owned by Hormel and stored in Crystal's warehouse in Waterloo, Iowa. In June 2008, flood water entered the warehouse, damaging meat products stored in the lower level. In seeking to recover its loss, Hormel alleged three counts of breach of contract and one count of negligence. Crystal filed a counterclaim, seeking reimbursement for the cost of disposing of the products.

Both parties filed motions for summary judgment. In an Order filed on May 27, 2011, Judge Edward J. McManus denied Hormel's motion for partial summary judgment, and granted Crystal's motion for summary judgment, in part.[1] Among other things, Judge McManus concluded that pursuant to the economic loss doctrine, Hormel's remedy lies in contract, rather than in tort. Accordingly, Count IV of the complaint was dismissed. Since only contract claims remain, Judge McManus further concluded that the collateral source rule does not apply. Additional relevant facts will be set forth below.

---

[1] With the parties' consent, this matter was subsequently referred to the undersigned magistrate judge for all further proceedings, pursuant to 28 U.S.C. § 636(c). *See* docket number 54. A jury trial is scheduled to begin on April 9, 2012.

## III. HORMEL'S MOTIONS IN LIMINE

### A. Salvage Evidence

On June 11, 2008, Crystal was storing Hormel's products on several levels in its warehouse, including a level which was "below grade."[2]  Widespread flooding caused water to enter the lower level of the warehouse and to come into contact with some portion of Hormel's products.  The United States Department of Agriculture ("USDA") detained all of the food products, including those owned by Hormel in the lower level of the warehouse.[3]  Hormel and Crystal "coordinated" with the USDA to dispose of the products in an appropriate sanitary landfill.[4]  Now, Crystal asserts that some of the damaged products could have been salvaged.

If permitted to do so, Crystal will call Mark Ruddy to testify that the damaged products had a gross salvage value of approximately $700,000.  Hormel argues that Ruddy is not qualified to render an expert opinion in this regard and, in any event, his proposed testimony is "pure speculation."  Hormel also argues that Crystal "waived any such argument with respect to salvage when it developed the disposal plan for all of its impacted customers."[5]  Crystal responds that "Hormel made the unilateral decision to dispose of all of the goods," and that Ruddy is fully qualified to express an opinion that he "could have persuaded the USDA to reconsider its order detaining Hormel's goods."[6]

On June 18, 2008 – one week after water initially entered the lower level of the warehouse – Tom Poe of Crystal wrote a letter to Brian Hendrickson of Hormel, regarding disposition of the damaged products.  The letter provided, in part:

---

[2] *See* Stipulation of Facts in Final Pretrial Order (docket number 113) at 2.

[3] *Id.*

[4] *Id.*

[5] Hormel's Motion in Limine to Exclude Salvage Evidence (docket number 78), ¶ 14 at 3.

[6] Crystal's Response (docket number 111) at 1 and 3.

The onsite USDA representative inspected those products and determined that they are adulterated and placed the products on a 20 day detention to allow you time to voluntarily dispose of the products as allowed by law.

One acceptable method of voluntary disposal is the voluntary destruction of the products determined by the USDA to be adulterated. At USDA's request we have enclosed a letter the USDA requires be signed by each of our customers requesting the voluntary destruction of the products which are currently in storage in our basement storage rooms. If you choose to have the products we are currently storing for your company's account in our basement storage rooms voluntarily destroyed, please place the enclosed letter on your company's letterhead, sign it and return it to us as soon as possible. We will then deliver the letter to the USDA.

If you believe that you are entitled, under the law, to pursue a different form of voluntary disposition, we suggest that you do so immediately, since the USDA has indicated that the products will not be subject to a new detention unless a written extension is requested and approved by USDA. There is a great urgency to remove the adulterated product as soon as possible. Our hope is to begin the disposal process as early as tomorrow, June 19, 2008.

Letter from Tom Poe to Brian Hendrickson, dated June 18, 2008 (docket number 78-2 at 32). The proposed letter to the USDA – enclosed with Poe's letter – refers to transporting the products to the Black Hawk County Landfill for disposal.

The parties have stipulated that they "coordinated" with the USDA to dispose of the products at the sanitary landfill. Hormel argues that Crystal has thus waived any claim that the products had salvage value. Crystal asserts, however, that Hormel's decision was "unilateral." Donald Johnston and Tom Poe testified at their depositions that they spoke with Hormel regarding whether the products were "potentially salvageable." When asked who he spoke to, Johnston responded "I guess I'd have to say it was probably Brian

Hendrickson."[7] Given the disputed testimony, the Court cannot say on this record that Crystal waived a claim that the products had salvage value.

FEDERAL RULE OF EVIDENCE 702 permits a qualified expert to testify regarding his opinion if (a) the knowledge will help the jury to determine a fact issue, (b) the opinion is based on sufficient facts, (c) the opinion is based on reliable principles and methods, and (d) the expert has "reliably applied the principles and methods to the facts of the case." Here, Hormel argues that Ruddy is not qualified to render an expert opinion, nor is his opinion based on a reliable application of principles and methods to the facts in this case.

Hormel's products were stored in the basement on pallets stacked two-high. Apparently, the water rose partway up on the first pallet. Hormel was also concerned, however, about the exposure of the products to increased heat and humidity. The products were to be stored at 35 degrees Fahrenheit. It is apparently undisputed that power was lost to the warehouse for 24 hours, and the temperature rose to 45-50 degrees. After conceding that he is not a "microbiology expert," Ruddy opined that "canned hams that sat at 50 degrees for a week would be totally acceptable."[8] Similarly, after conceding that he was not "an expert in the degradation" of bacon, Ruddy opined that under the facts in this case "both of these products are salvageable."[9]

Importantly, however, there is no basis for believing that Ruddy's proposed salvage plan would have been accepted by the USDA. Crystal has stipulated that Hormel's food products stored on the lower level of the warehouse were detained by the USDA. Ruddy conceded that he had not spoken with USDA officials regarding the proposed plan. At the time of hearing, Crystal's attorney advised the Court that the plan had not been submitted to the USDA, nor would anyone from the USDA testify at trial that the proposal would have been acceptable to them. As noted by Hormel in its brief, for Ruddy's testimony to

---

[7] Deposition of Donald Johnston (docket number 78-2 at 23), 208:3-8.

[8] Deposition of Mark Ruddy (docket number 78-2 at 38), 47:7-10.

[9] *Id.* (docket number 78-2 at 42), 42:7-18.

assist the jury in determining if the products had salvage value, it must be assumed that the USDA would have approved of the plan to move the products to another facility, that another federally-inspected facility was available and willing to accept the products, that following cleaning and testing the products would have been found safe and marketable, that the USDA would have then released the products for sale, and that buyers for the previously-flooded products could be found. There is no evidence the USDA would have accepted the plan, that another facility was readily available, that Ruddy is qualified to opine whether or not the products were contaminated, and whether a market existed for the flood-impacted products.

The Court concludes that Ruddy's opinions are not based on sufficient facts or data. Furthermore, his proposed testimony is not the product of a reliable methodology. The Court agrees with Hormel that Ruddy's testimony is based almost entirely on speculation. Accordingly, it is inadmissible under Rule 702. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) ("Expert testimony that is speculative is not competent proof and contributes 'nothing to a legally sufficient evidentiary basis.'"). Crystal may not offer Ruddy's expert testimony that the damaged food products had salvage value. Absent expert testimony, the Court further concludes that evidence of discussions between the parties, if any, regarding whether the products were "potentially salvageable" is substantially outweighed by the danger of confusing the issues or misleading the jury, and is inadmissible pursuant to FEDERAL RULE OF EVIDENCE 403. There is no competent evidence which would allow the jury to place a salvage value on the affected products.

### B. Raymond Tarnowski

Crystal has disclosed Raymond Tarnowski as an expert witness who will testify on its behalf. Tarnowski, who is an experienced warehouse operator, will testify regarding "reasonable warehousing practices." Hormel argues that Tarnowski does not qualify as an expert, his opinions "are not based on any methodology," and his testimony is "contrary to the facts."

According to his curriculum vitae (Defendant's Trial Exhibit 2021), Tarnowski has been president of the Philadelphia Warehousing and Cold Storage Company for nearly 30 years. Prior to that time, he served as its warehouse superintendent. Tarnowski is active in various trade organizations and has served as chairman of the International Association of Refrigerated Warehouses (IARW), president of the World Food Logistics Organization (WFLO), treasurer and director of the National Frozen and Refrigerated Foods Association (NFRFA), and president of The Refrigeration Research Education Foundation (TRREF). In 1977, Tarnowski received a bachelor of science degree in finance and accounting from the Philadelphia College of Textiles and Science (n/k/a Philadelphia University).

If permitted to do so, Tarnowski will testify regarding the "appropriateness" of Crystal's actions in anticipation of the impending flood in June 2008. According to his written report (Defendant's Trial Exhibit 2020), Tarnowski will opine that Crystal took appropriate action, would not have been put on notice that water would enter the lower level of its warehouse, could not have anticipated that water would enter through the floor drains, and took appropriate action to prevent and minimize water damage after water began entering the lower level. Included in the report are the bases for Tarnowski's opinions. Hormel asserts that Tarnowski does not qualify as an expert and that his opinions rest on mistaken facts.

First, the Court concludes that Tarnowski qualifies generally as an expert in the area of safe warehousing practices. FEDERAL RULE OF EVIDENCE 702 provides that a witness may qualify as an expert "by knowledge, skill, experience, training, or education." While Tarnowski did not receive a formal education in "warehousing," he qualifies as an expert in warehousing practices by knowledge and experience. In 2000, Rule 702 was amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The Advisory Committee Notes to the 2000 amendments state:

> "Nothing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."

This case appears to be the converse of the circumstances addressed by the Court in *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706 (8th Cir. 2001). Wheeling brought an action against Beelman to recover damages sustained to Wheeling's steel – which was stored at Beelman's warehouse – during a flood. Beelman called a hydrologist specializing in flood risk management to testify regarding the circumstances surrounding the loss. While the expert was "eminently qualified to testify as an expert hydrologist regarding matters of flood risk management, [he] sorely lacked the education, employment, or other practical personal experiences to testify as an expert specifically regarding safe warehousing practices." *Id.* at 715. The district court erred in permitting the expert to repeatedly testify "outside of his area of expertise on ultimate issues of fact that the jury was required to answer – namely, whether Beelman's actions met the required standard of care for a warehouseman." *Id.*

> [I]t is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case. Once initial expert qualifications and usefulness to the jury are established, however, a district court must continue to perform its gatekeeping role by ensuring that the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable under rule 702.

*Wheeling Pittsburgh*, 254 F.3d at 715 (citing *Kumho Tire*, 526 U.S. at 156).

Here, Tarnowski clearly qualifies as an expert regarding warehouse practices. Tarnowski is not an engineer or hydrologist, however, and may not testify generally regarding the effect of flood water on sanitary sewers, storm sewers, or related matters.

Hormel also argues that Tarnowski's opinions are based on an inadequate or erroneous factual foundation. Hormel notes that Tarnowski has never been to Crystal's warehouse in Waterloo, has not observed its proximity to the Cedar River, and has no knowledge of the elevation of Crystal's basement in relation to the Cedar River. Moreover, Tarnowski does not have any experience in dealing with flooding or water backing up into his warehouse, and has no experience storing products below grade. In response, Crystal disputes Hormel's factual assertions.

The parties dispute whether Tarnowski's opinions are based on accurate information. The jury must determine the facts from the evidence, and decide whether any factual disputes affect Tarnowski's opinions. *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004) ("The district court must exclude expert testimony if it is 'so fundamentally unreliable that it can offer no assistance to the jury,' otherwise, the factual basis of the testimony goes to the weight of the evidence.") (quoting *Children's Broadcasting Corp. v. Walt Disney Co.*, 357 F.3d 860, 864 (8th Cir. 2004)). The Court concludes that Tarnowski should be permitted to testify regarding matters within his expertise, and the jury will decide what weight to give that testimony. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) ("Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility.").

## C. Warehouse Receipts

On January 15, 1990, Hormel and Crystal entered into a Warehouse Agreement. Crystal agreed to store Hormel's products at its warehouse in Waterloo in exchange for payment by Hormel. While the initial agreement had a term of one year, it was automatically renewed annually, and continued through and after the flood of 2008.[10] Among other things, Crystal was required to issue warehouse receipts documenting the products accepted and stored by Crystal.[11] *See* Warehouse Agreement (Plaintiff's Trial

---

[10] *See* Stipulation of Facts in Final Pretrial Order (docket number 113) at 2.

[11] Crystal's Trial Exhibit 2007 consists of 1,620 pages of warehouse receipts.

Exhibit 1), ¶ 20 at 9. Hormel asks that the Court "preclude Crystal from introducing any evidence regarding or related to the terms and conditions on Crystal's warehouse receipts."[12]

It is undisputed that Article 7 of the Uniform Commercial Code ("UCC") applies to the parties' transactions, and governs the issuance of warehouse receipts. *See* Iowa Code section 554.7101 *et seq*. The Warehouse Agreement anticipated application of the UCC and the issuance of warehouse receipts, and established a process for resolving any conflicts.

> The duties and obligations of [Crystal] to HORMEL and HORMEL to [Crystal] in the storage and handling of the product of HORMEL shall be set forth and described in the Uniform Commercial Code and in this agreement. To the extent any of the terms of the Uniform Commercial Code and this Agreement may be inconsistent, the terms and conditions embodied in this agreement, shall control and modify the Uniform Commercial Code. *Further, to the extent any terms of this Agreement conflict with any language contained on [Crystal's] warehouse receipts or other documents, the terms and conditions of this Agreement shall control.*

Warehouse Agreement (Hormel's Trial Exhibit 1), ¶ 11 at 6 (emphasis added). The supremacy of the Agreement over any terms found in the warehouse receipts is repeated later in the Agreement:

> To the extent that any discrepancy between the terms and conditions contained in this Agreement and those contained in any Agreement provided by the warehouse are in conflict, the terms and conditions contained and embodied in this Agreement shall control.

Warehouse Agreement (Hormel's Trial Exhibit 1), ¶ 32 at 13.

_____

[12] Hormel's Motion in Limine to Exclude Evidence Regarding the Terms and Condition of Crystal's Warehouse Receipts (docket number 80) at 3.

According to Crystal's attorney, the "primary" dispute in this regard is whether the limitation of liability provision found on the warehouse receipts limits the damages which Hormel may otherwise recover. The form warehouse receipt provides, in part:

> IN THE EVENT OF LOSS, DAMAGE OR DESTRUCTION TO GOODS FOR WHICH THE COMPANY IS LEGALLY LIABLE, STORER DECLARES THAT COMPANY'S LIABILITY SHALL BE LIMITED TO THE LESSER OF THE FOLLOWING: (1) THE ACTUAL COST TO STORER OF REPLACING, OR REPRODUCING THE LOST, DAMAGED, AND/OR DESTROYED GOODS TOGETHER WITH TRANSPORTATION COSTS TO WAREHOUSE, (2) THE FAIR MARKET VALUE OF THE LOST, DAMAGED, AND/OR DESTROYED GOODS ON THE DATE STORER IS NOTIFIED OF LOSS, DAMAGE AND/OR DESTRUCTION, (3) 50 TIMES THE MONTHLY STORAGE CHARGE APPLICABLE TO SUCH LOST, DAMAGED AND/OR DESTROYED GOODS, (4) $0.50 PER POUND FOR SAID LOST, DAMAGED, AND/OR DESTROYED GOODS, PROVIDED, HOWEVER, THAT WITHIN A REASONABLE TIME AFTER RECEIPT OF THIS WAREHOUSE RECEIPT, STORER MAY, UPON WRITTEN REQUEST INCREASE COMPANY'S LIABILITY ON PART OR ALL OF THE GOODS IN WHICH CASE AN INCREASED CHARGE WILL BE MADE BASED UPON SUCH INCREASED VALUATION; FURTHER PROVIDED THAT NO SUCH REQUEST SHALL BE VALID UNLESS MADE BEFORE LOSS, DAMAGE OR DESTRUCTION TO ANY PORTION OF THE GOODS HAS OCCURRED.

Warehouse Receipt (Crystal's Trial Exhibit 2004), § 9(d) at 2.

Here, Crystal argues that Hormel's recovery is limited to 50 cents per pound. At the hearing, Crystal's attorney estimated the limit of liability at $1.2 million, rather than $4 million, as claimed by Hormel. Hormel argues that this limitation of liability conflicts with the parties' Warehouse Agreement, which requires Crystal to indemnify Hormel for "any and all claims" resulting from Crystal's negligence.

> [Crystal] shall indemnify and save HORMEL harmless from
> and against any and all claims for loss or damaged product
> which results from the negligence of [Crystal], its employees
> and agents.

Warehouse Agreement (Plaintiff's Trial Exhibit 1), ¶ 12 at 7.

Hormel argues that admission of the warehouse receipts would violate the parole evidence rule. Hormel asserts that the parties' Warehouse Agreement is fully integrated.[13] The parole evidence rule forbids the use of extrinsic evidence to vary, add to, or subtract from the Agreement. *C&J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 85 (Iowa 2011). Crystal notes that in his ruling on the parties' motions for summary judgment, Judge McManus found that "the Agreement expressly referred to warehouse receipts in paragraphs 11, 20, and 32."

In resolving the limitation of liability issue, the Court finds it unnecessary to determine whether the warehouse receipts were "incorporated" into the parties' Warehouse Agreement. By the clear terms of the Warehouse Agreement, any conflict between the language of the Agreement and the warehouse receipts is controlled by the Agreement. Here, the purported limitation of liability found in section 9(d) of the warehouse receipts conflicts with the language found in the Agreement, which requires Crystal to indemnify Hormel for "any and all" loss or damage to its products caused by Crystal's negligence. The parties agreed that to the extent any terms of the Agreement conflicted with language contained in the warehouse receipts, "the terms and conditions of this Agreement shall control." Warehouse Agreement (Hormel's Trial Exhibit 1), ¶ 11 at 6. Similarly, the parties agreed that if there was a discrepancy between the terms and conditions contained

---

[13] The Agreement provides, in part, as follows:
> This Agreement, and the Appendices attached hereto,
> constitute the entire understand of the parties, and any
> representations or agreements not contained herein are
> unenforceable.

Warehouse Agreement (Plaintiff's Trial Exhibit 1), ¶ 31 at 13.

in the Agreement and those contained in any agreement provided by the warehouse, then the Warehouse Agreement was controlling. *Id.*, ¶ 32 at 13.

The Court concludes, as a matter of law, that the terms of the warehouse receipts which purport to limit Crystal's liability to 50 cents per pound conflict with the Warehouse Agreement, which requires Crystal to pay "any and all" losses resulting from its negligence. Pursuant to its terms, the Warehouse Agreement is controlling. Crystal may not offer evidence of the warehouse receipts for the purpose of limiting the amount of its liability pursuant to section 9(d). It is unclear to the Court whether the warehouse receipts are offered for any other purpose. The Court reserves ruling in that regard.

### D. Insurance Provisions

The Warehouse Agreement required Crystal to maintain a liability insurance policy, or "satisfactory bond," to cover losses sustained by Hormel.

> [Crystal] shall maintain a warehouseman's legal liability policy covering all risks of loss or it shall provide satisfactory bond to HORMEL, covering all risks of LOSS.

Warehouse Agreement (Plaintiff's Trial Exhibit 1), ¶ 28 at 12.

In its complaint, Hormel asserts that Crystal failed to obtain a policy covering "all risks of loss," nor did it obtain an equivalent bond. In Count II of its complaint, Hormel seeks damages sustained as a result of this alleged breach of contract. In its motion *in limine*, Hormel asks that Crystal be precluded "from introducing any evidence concerning or related to the meaning of the insurance provision of the Agreement."[14] Crystal responds by arguing that the testimony is necessary and appropriate "to aid in the process of interpretation of a contract."[15]

---

[14] Hormel's Motion in Limine to Exclude Testimony Regarding the Insurance Provisions of the Agreement (docket number 87) at 2.

[15] Crystal's Response (docket number 112) at 1.

Hormel first argues that admission of the disputed evidence violates the parole evidence rule. The parole evidence rule forbids the use of extrinsic evidence to vary, add to, or subtract from the Agreement. *C&J Vantage Leasing Co.*, 795 N.W.2d at 85. Crystal does not disagree. Crystal argues, however, that while extrinsic evidence is not allowed to vary the Agreement, it is permitted to aid in the process of interpreting the contract. *Uhl v. City of Sioux City*, 490 N.W.2d 69, 73 (Iowa App. 1992) ("Outside evidence is admissible to construe the language of a contract after the language is found to be ambiguous and subject to two different reasonable interpretations.").

Here, Hormel focuses on that portion of the Agreement which requires a policy covering "all risks of loss." Hormel argues that the Agreement requires Crystal to insure against all losses, regardless of whether they were caused by any fault of Crystal. Crystal, on the other hand, focuses on that part of the Agreement which requires it to maintain "a warehouseman's legal liability policy." According to Crystal, the Agreement thus limits the policy to that which is generally obtained by a "warehouseman," and covers only those losses for which a warehouseman is legally liable.

Contract interpretation requires a determination of the meaning of the words used by the parties in a contract. *Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 435 (Iowa 2008). Extrinsic evidence is allowed to aid in the process of interpretation. *Id.* at 436. However, the words used in the Agreement are still the "most important evidence" in determining the parties' intentions. *Id.* "When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence, the question of interpretation is determined by the finder of fact." *Id.*

As Crystal concedes, it cannot introduce testimony for the purpose of varying, adding to, or subtracting from the terms of the Agreement. That is, extrinsic evidence is not admissible to show "what the parties meant to say," instead of "what was meant by what they said." *Bankers Trust Co. v. Woltz*, 326 N.W.2d 274, 276 (Iowa 1982). Extrinsic evidence is admissible, however, as an aid to interpretation "when it throws light

on the situation of the parties, antecedent negotiations, the attendant circumstances and the objects they were striving to attain." *Dental Prosthetic Services., Inc. v. Hurst*, 463 N.W.2d 36, 39 (Iowa 1990). The Court concludes the parties are permitted to offer evidence to aid the jury in determining what was meant by the parties in their Agreement.

Hormel further argues that Crystal's designated expert – Marcia Anderson-Youngberg – is not qualified to testify as an expert regarding the interpretation of the Warehouse Agreement. While Anderson-Youngberg is apparently an expert in interpreting insurance policies and insurance contracts, she admitted in her deposition that she does not have expertise in interpreting other legal contracts, such as warehouse agreements. Anderson-Youngberg also admitted that she is not an expert in the "public warehousing industry." If permitted to do so, however, Anderson-Youngberg will testify that Crystal "could not purchase a warehouse legal liability policy covering all risk of loss."

The Court concludes that the evidence proffered by Crystal, including the expert testimony, "throws light on the situation of the parties," and would aid the jury in the interpretation of the Warehouse Agreement. The Court concludes that limited expert testimony by Anderson-Youngberg will be permitted.

## IV. CRYSTAL'S MOTIONS IN LIMINE

### A. Damages Paid By Hormel's Insurers

Hormel claims a loss due to flood-damaged products of just over $4 million. It is undisputed that Hormel has been reimbursed by its insurers in the amount of just over $3 million. That is, Hormel's unreimbursed loss is approximately $1 million. Crystal asks that Hormel be prohibited from seeking any recovery for losses reimbursed by its insurers.

Resolution of this issue requires a review of the collateral source rule. "Under the collateral source rule a tortfeasor's obligation to make restitution for an injury he or she caused is undiminished by any compensation received by the injured party from a collateral source." *Schonberger v. Roberts*, 456 N.W.2d 201, 202 (Iowa 1990). In this case, however, Hormel's tort claim (Count IV) was dismissed by Judge McManus in his ruling

on Crystal's motion for summary judgment. Since only contract claims remain, Judge McManus concluded that the collateral source rule is inapplicable, citing *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823 (Iowa 1998). Hormel thus concedes that Crystal is entitled to offer evidence that a portion of Hormel's losses were reimbursed by its insurers.

Hormel argues, however, that the collateral source rule is simply a rule of evidence, and does not prohibit Hormel from recovering reimbursed losses, provided Hormel establishes the insurers' right to subrogation. According to Hormel, Iowa Code section 668.14 – which by its terms applies only to personal injury actions – is instructive. In section 668.14, the Iowa Legislature modified the common law collateral source rule by permitting evidence as to previous payments of actual economic losses. If evidence of prior payments is introduced, however, then the Court is also required to permit evidence of the right to subrogation. Hormel suggests that this methodology was adopted to prevent double recovery by a claimant, while protecting a collateral source's right to repayment.

As noted by the Iowa Supreme Court in *Midland Mutual*, one of the criticisms of the collateral source rule "is that when a plaintiff receives collateral benefits which are not subject to a right of subrogation and subsequently receives compensation for the same injuries via a tort suit against the defendant, the plaintiff receives duplicate damages," otherwise known as "double dipping." 579 N.W.2d at 829. This result is considered preferable, however, to the alternative "in which the tortfeasor would receive credit for payments to the plaintiff from a collateral source and would not be held responsible for the full consequences of his or her tortious conduct." *Id.* Similarly, Hormel asserts that Crystal should not "receive credit" for the fact that Hormel was insured.

The Court concluded in *Midland Mutual* that the common law collateral source rule did not apply for two reasons: First, the payments made in that case were not true "collateral source" payments. Second, and more importantly to the instant action, the Court concluded that the collateral source rule did not apply in breach of contract cases.

We also reject Midland's argument regarding the collateral source rule on the ground that the rule should not be applied in pure breach of contract cases, based on the rationale behind the collateral source rule and the principles underlying the calculation of damages in a breach of contract action. One significant purpose of the collateral source rule in tort actions, as mentioned above, is to prevent the tortfeasor from a windfall when some or all of the plaintiff's damages are paid from another source. Offsetting such payments against the plaintiff's damages would benefit the defendant, the culpable party. (citation omitted) The rule is also intended to have both a punitive and a deterrent effect.

These proffered justifications for application of the common-law collateral source rule in tort actions have little or no applicability to breach of contract actions. As noted in the Restatement:

> The principle that a party's liability is not reduced by payments or other benefits received by the injured party from collateral sources is less compelling in the case of a breach of contract than in the case of a tort.

Restatement (Second) of Contracts § 347 cmt. e (1979). The principle behind the collateral source rule is less compelling in contract actions because of the inapplicability of the deterrence factor in such cases and the countervailing principle that "no one should profit more from the breach of an obligation than from its full performance." 22 Am. Jur. 2d *Damages* § 568 (1988).

Standard principles of contract damages reinforce the notion that the common-law collateral source rule should not apply in breach of contract actions. Typically, the nonbreaching party's recovery is limited to "the loss he has actually suffered by reason of the breach." *Id.* § 45. "The measure of damages for the breach of a contract is the amount which would have been received if the contract had been performed." *Id.* Thus, damages in the breach of contract setting are intended to be compensatory only, not punitive in nature. Application of the common-law collateral source rule in contract actions would

> contravene this principle by awarding the nonbreaching party
> more damages than necessary to compensate it for the breach.

*Midland Mutual*, 579 N.W.2d at 829-30. The Court concluded "based on logic and weight of authority from other jurisdictions, that the common-law collateral source rule should not apply in pure breach of contract actions." *Id.* at 830.

Accordingly, this much is clear: the collateral source rule does not apply in this action. Crystal is therefore not prohibited from offering evidence that a substantial portion of Hormel's loss was reimbursed by its insurers. What is less clear is this: is Hormel nonetheless entitled to recover the reimbursed losses if the insurers' right to subrogation is shown, similar to the statutory scheme adopted for payment of economic losses in personal injury actions? Or, is the amount "necessary to compensate" Hormel for the breach limited to its unreimbursed loss?

In support of its argument that Hormel is not entitled to recover losses reimbursed by insurance, Crystal cites *Rawlins Constr., Inc. v. Downes*, 225 F.3d 659 (6th Cir. 2000), 2000 WL 977355 (C.A. 6 (Tenn.)) (unpublished table decision) [*Rawlins I*], and *Rawlins Constr. Co. v. Downes*, 45 Fed. Appx. 496 (6th Cir. 2000), 2002 WL 31001424 (C.A. 6 (Tenn.)) (unpublished table decision) [*Rawlins II*]. Rawlins, a general contractor, was hired to build a retail store. Rawlins entered into a written contract with Downes to construct the masonry walls. Unfortunately, both walls built by Downes collapsed. Rawlins recovered $180,000 from its builder's risk insurance policy due to the collapse of the walls, and then sued Downes for breach of contract. The jury found for Rawlins and determined the damages to be $134,114. The district court found that the collateral source rule did not apply to claims arising out of a contract, but, curiously, nonetheless excluded evidence of the $180,000 received by Rawlins from its insurer. Even more curiously, the Sixth Circuit Court of Appeals concluded that the district court did not err in finding the collateral source did not apply to contract actions, but further concluded that "the district court did not abuse its discretion in excluding the evidence of an insurance policy or payments under the policy." *Rawlins I* at *2. In concluding that the collateral

source rule did not apply to the contract action, the Sixth Circuit appeared to agree with Crystal's argument that a plaintiff cannot recover for any amount paid by insurance.

> The collateral source rule provides that compensation from an independent source should not be deducted from the award of damages. (citation omitted) Thus, if the collateral source rule is not applied, the Rawlins award of $134,114 must be offset by the $180,000 insurance payment Rawlins received, which would result in no monetary award.

*Rawlins I* at *1. After finding that the collateral source rule did not apply, the district court nonetheless entered judgment in the amount of $139,114 in favor of Rawlins. The Court of Appeals stated that "[c]learly, such a judgment is at odds with the district court's own determination that the collateral source rule does not apply, not to mention contrary to Tennessee law." *Id.* The Court remanded the case to the district court "to resolve this conflict." *Id.* Following remand, the Sixth Circuit Court of Appeals issued a one-page *per curiam* decision affirming an award of attorney fees to Rawlins as the "prevailing party." *Rawlins II* at *1. The Sixth Circuit made only a passing reference to the collateral source issue, noting that the district court's initial finding that the collateral source rule did not apply, as opposed to the later award of judgment to the plaintiff, "would appear to be the correct one." *Rawlins II* at *1. There is no reference in either *Rawlins* decision regarding whether Rawlins' insurer had a right to subrogation.

After responding to the collateral source issue by arguing that it is simply a rule of evidence and does not prohibit Hormel from recovering reimbursed losses when there is a right to subrogation, Hormel pivots to a "real party in interest" argument and FEDERAL RULE OF CIVIL PROCEDURE 17. Hormel first argues that it is the real party in interest with respect to the entire amount of its damages, including the portion reimbursed by its insurers, citing Iowa tort cases. Alternatively, Hormel argues that if the Court concludes that it is not the real party in interest with respect to reimbursed losses, then its action has nonetheless been ratified by its insurers – the purported real parties in interest. A failure to bring an action by a real party in interest will not result in dismissal if the real party in interest ratifies the action.

> The Court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

FED. R. CIV. P. 17(a)(3).

In support of its argument, Hormel cites *Metal Processing, Inc. v. Humm*, 56 F. Supp. 2d 455 (D.N.J. 1999). After settling with the plaintiff, a defendant (McAllister) pursued a claim for contractual indemnification against a co-defendant (Scott). McAllister settled the plaintiff's claim for $2,035,000, but only paid $200,811, with the balance paid by McAllister's insurers. Scott claimed that McAllister was not the real party in interest for the entire $2,000,000 being sought in the cross-claim. *After* the trial, McAllister's attorney sent the court a "Ratification of McAllister's Action," whereby its insurers "ratified all actions taken by McAllister in this matter past and future, including the commencement of a cross-claim against Scott." *Id.* at 462. The Court concluded that Rule 17(a) – requiring an action to be brought by the real party in interest – did not require dismissal of the claim:

> Rather than require dismissal of the action where the insured sues without the subrogated insurer, courts have held that where there is partial subrogation the insured may file suit in its own name for the entire amount of the claim, without naming the insurer as a co-plaintiff.

*Metal Processing*, 56 F. Supp. 2d at 461.

Hormel also cites *Sovereign Chem. and Petroleum Prod., Inc. v. Ameropan Oil Corp.*, 148 F.R.D. 208 (N.D. Ill. 1992), in support of its argument that Hormel may pursue the entire loss in this case. Sovereign sued Ameropan when it provided the incorrect grade of fuel oil for Sovereign's boiler, damaging the boiler and causing other damages. Of the $478,000 claimed in damages, Sovereign was reimbursed by its insurer for $453,000. Ameropan contended that the real party in interest was Sovereign's insurer.

The Court found that "[u]nder federal procedural rules, when part of an insured's claim is subrogated to an insurer, both the insured and the insurer are real parties in interest." *Id.* at 210. Since the insurer had "ratified the action brought by Sovereign, thereby insuring that Home Insurance would be bound by any adverse decision against Sovereign," the Court concluded that the insurer was not an "indispensable party" and the action could proceed in Sovereign's name only. *Id.*

Finally, Hormel cites *Aquila, LLC v. City of Bangor*, 640 F. Supp. 2d 92 (D. Me. 2009). Aquila suffered damages to an aircraft as a result of the City's negligent maintenance. Aquila sought judgment of nearly $1.5 million, including $127,608 for repairs which were paid by Aquila's insurer. The City argued that Aquila was not the real party in interest for the repairs paid by its insurer. *Id.* at 99. A magistrate judge agreed with the City and recommended that the district court enter summary judgment precluding Aquila from recovering the cost of those repairs. *Id.* at 100. The district court disagreed. While recognizing that Rule 17 requires an action to be prosecuted in the name of the real party in interest, the court noted that Rule 17(a)(3) prohibits dismissal of an action for that reason, if the real party in interest has been allowed to ratify the action. In *Aquila*, an "assignment" signed by both Aquila and its insurer was filed with the court *after* the magistrate judge had recommended dismissal of the claim. Although the document did not use the term "ratify," the district court accepted the assignment "as an effective ratification," and permitted Aquila to seek full recovery. *Id.* at 101-02.

Turning back to the facts in the instant action, Hormel allegedly suffered approximately $4 million in losses to flood-damaged products. Of that amount, Hormel's four insurers paid approximately $3 million. On March 1, 2012, the four insurers each filed a "Ratification Affidavit," stating that it agreed with Hormel to retain the Faegre & Benson law firm "in pursuit of its subrogated interests in the pending litigation and to be bound by the outcome of the litigation." *See* docket number 74-1 through 74-4. "In a diversity action, state law determines the issue of who is a real party in interest." *Jaramillo v. Burkhart*, 999 F.2d 1241 (8th Cir. 1993) (citation omitted). Hormel argues

that under Iowa law, it is the real party in interest for the entire loss, including that portion reimbursed by its insurers. Crystal infers that in a *contract* action, an insured is not the real party in interest for reimbursed losses.[16] The Court finds it unnecessary to resolve that dispute. Procedurally, in federal court the real party in interest may ratify an action pursuant to Rule 17(a)(3). Even *if* it is determined that the insurers are the real parties in interest for the reimbursed losses, they have ratified the action Hormel is taking to recover those claims. The Court finds that the ratifications should be adopted.

The claimants in *Metal Processing*, *Sovereign*, and *Aquila* were all permitted to seek recovery for the entire amount of their loss, including those portions reimbursed by insurance. It must be noted, however, that the defendants challenged the right to recover reimbursed losses on a real party in interest theory. The defendants apparently did not assert an argument that because the collateral source rule is typically inapplicable to contract actions, the plaintiffs were prohibited from recovering reimbursed losses. Nonetheless, Hormel asserts that prohibiting its recovery for reimbursed losses in this case would be "inconsistent" with Rule 17.

Application of the collateral source rule in contract actions has not been widely discussed. One commentator has suggested that areas in other than tort law, "it has led little more than a shadow existence." John G. Fleming, *The Collateral Source Rule and Contract Damages*, 71 Cal. L. Rev. 56, 56 (1983). Many cases, such as the *Rawlins* cases cited by Crystal, reflexively suggest that a plaintiff in a contract action cannot recover for losses reimbursed by an insurer. The language employed by the Iowa Supreme Court in *Midland Mutual* suggests reasons why a distinction may be drawn between contract actions and tort actions. 579 N.W.2d at 829-30. *Midland Mutual* did not discuss the issue, however, of whether an insured may recover for the entire loss when a subrogation right is established and when the insurer has ratified the action.

---

[16] Crystal expressly argues that Hormel lacks standing to assert a claim for reimbursed losses. The Court has previously rejected that argument. *See* Ruling on Motions for Leave to File (docket number 73).

More recently, courts have considered whether the collateral source rule applies in contract actions when the collateral source has a right to subrogation. *See, e.g.*, *Metoyer v. Auto Club Family Ins. Co.*, 536 F. Supp. 2d 664 (E.D. La. 2008). The collateral source rule may not apply when "even though the action was termed a breach of contract, the action had elements of tort" because the plaintiff had to prove negligence. *Id.* at 669 (citing *El Escorial Owners' Ass'n v. DLC Plastering, Inc.*, 154 Cal. App. 4th 1337, 65 Cal. Rptr. 3d 524 (2007)). Here, Hormel claims that Crystal breached paragraph 12 of the Warehouse Agreement, which requires Crystal to indemnify Hormel for any loss or damage to products resulting "from the negligence of [Crystal], its employees and agents." When there is no danger of a double recovery or windfall because of a subrogation right, it is suggested that evidence of the collateral payment may be excluded. *Id.* at 670.

Judge McManus has previously determined that the collateral source rule does not apply in this case, citing *Midland Mutual*. Accordingly, Hormel concedes that Crystal will be permitted to offer evidence regarding payments by Hormel's insurers. The fighting issue is whether Hormel's recovery is limited to unreimbursed losses, or if it may also recover reimbursed losses for which there is a right of subrogation. Hormel will not receive a double recovery and Crystal is not subject to a subsequent action by the insurers. Under the circumstances presented in this case, the Court concludes that a jury may award Hormel the full amount of its loss, provided Hormel is able to prove the insurers' rights to subrogation.

### B. Crystal's Prior Payments to Hormel

Both Hormel and Crystal maintain an inventory of Hormel products stored at Crystal's warehouse. There is a weekly reconciliation of those two inventories to make sure the parties are in agreement. Once each year, Hormel bills Crystal for any lost or missing products. On at least one occasion, there were also products lost to a fire at the warehouse. Thomas Poe, president of Crystal, testified at his deposition that Crystal

reviews the annual invoice for any errors, but did not contest the amounts owed. At his deposition, Poe did not know how the products were valued for this purpose.

In its second motion *in limine*, Crystal asks that Hormel be prohibited from offering any evidence regarding "any history of Crystal's reimbursement of Hormel foods for product losses at Crystal's warehouse, the parties' course of performance under the Warehouse Agreement, or 'trade usage' between the parties." It appears that Crystal is primarily concerned with evidence which may show payments which were inconsistent with the limitation of liability provision found in section 9(d) of the warehouse receipts. Hormel argues that the evidence is admissible to aid in the interpretation of the contract, including how the products were valued for purposes of reimbursement by Crystal.

Earlier in this ruling, the Court concluded that section 9(d) of the warehouse receipts – purporting to place a limitation on Crystal's liability – is inconsistent with the terms of the Warehouse Agreement and, therefore, is ineffective. Accordingly, evidence that Crystal previously paid Hormel's losses without regard to the purported limitation of liability is irrelevant. Nonetheless, the Court finds that the evidence is admissible for another purpose. Crystal claims that the measure of damages under the Warehouse Agreement is Hormel's cost of production. Hormel argues that the measure of damages is the wholesale price which it would have received if the products had not been damaged. The Court believes that the parties' course of performance is relevant to this issue.

It is undisputed that this transaction is governed by the UCC. The parties' course of performance "is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." Iowa Code § 554.1303(4). Accordingly, the conduct between the parties may be considered, along with the express terms of the Agreement and any relevant "usage of trade," in construing the Agreement. *See* § 554.1303(5). Crystal's request that Hormel be prohibited from offering evidence regarding payment of prior losses is denied.

### C. Failing to Obtain "All Risk" Insurance

Count II of Hormel's complaint alleges that Crystal breached the Agreement by failing to maintain a warehouseman's insurance policy covering "all risks of loss," or failing to provide an equivalent bond. Crystal asserts that Hormel's risk manager, Jeff Horner, "admitted that he had reviewed the warehouse legal liability insurance policy that Crystal had in place during June 2008 and concluded that the policy was an all-risk warehouseman's legal liability policy."[17] Crystal further asserts that Horner "admitted that Crystal complied with the requirements of paragraph 28 of the warehouse agreement."[18] Accordingly, Crystal asks that Hormel be prohibited from offering any evidence in support of its claim that Crystal breached the Warehouse Agreement by failing to obtain an all-risk legal liability insurance policy. Crystal provides no citation to authority.

In response, Hormel asserts that "Crystal had failed to produce a copy of its insurance policy prior to Mr. Horner's deposition and Mr. Horner had not reviewed the policy in effect at the time of the loss."[19] (In his deposition, Horner testified that within the "last month or so" he had reviewed the policy which was in place in June 2008.) Hormel also asserts that other witnesses, including Crystal's own expert, will testify that the policy does not cover all risks of loss. Hormel provides no citation to authority.

By asking that Hormel be prohibited "from making any direct or indirect reference whatsoever in person, by counsel, or through witnesses" to its claim that Crystal breached the Agreement by failing to obtain an all-risk policy, Crystal is effectively asking for summary judgment on Count II of the complaint. The Court finds the motion should be denied. The jury may consider Horner's testimony, together with all of the other evidence, in determining whether Hormel has proved Crystal breached the Agreement in this regard.

---

[17] Crystal's Motion in Limine No. 3 (docket number 84) at 1.

[18] *Id.* at 2.

[19] Hormel's Response (docket number 100) at 1.

### D. Using the Term "Basement"

The parties have stipulated that on June 11, 2008, Crystal was storing Hormel's products on several levels in its warehouse, including a level which is "below grade." Crystal asks, without citation to authority, that Hormel be prohibited from referring to this "below grade" level as a "basement." Crystal asks that the Court order Hormel to refer instead to the "lower level." The Court notes that in his letter to Hormel on June 18, 2008, Crystal's president, Tom Poe, twice referred to "our basement storage rooms." The motion is denied.

### E. Special Valuation Clause

The warehouseman's legal liability policy obtained by Crystal (Defendant's Trial Exhibit 2055) contains a "Special Valuation Clause" on the declarations sheet, which states:

> The product of Hormel stored at Loc. #3 (1442 Sycamore Street, Waterloo, IA) shall be valued at $2.00 per pound for a maximum of 1,000,000 pounds stored at any one time.

Crystal's Trial Exhibit 2055 at 2.

The insurance renewal application signed by Don Johnston, Crystal's vice president of operations, on January 21, 2008, states in part:

> List any special agreements to store commodities whereby YOU assume liability beyond that stated in the warehouse receipt:

| Customer | Amount of Product | Liability |
|----------|-------------------|-----------|
| Hormel   | 1,000,000         | $2.00     |

Crystal's Trial Exhibit 2057 at 7-9.

Crystal argues that its liability, if any, is limited by section 9(d) of the warehouse receipts. Accordingly, Crystal argues that the special valuation placed on Hormel's products for insurance purposes is irrelevant to the issues to be decided by the jury. Hormel believes that the evidence shows the parties did not believe that section 9(d) of the warehouse receipts limited Crystal's liability. As discussed above, the Court has rejected

Crystal's claim that its liability is limited by the terms of the warehouse receipts. At the time of hearing, Hormel's counsel conceded that if the limitation of liability language found in the warehouse receipts is found to be ineffective, then the "special valuation clause" of the insurance policy has no relevance or probative value.

As noted by Hormel, however, Crystal has identified the warehouseman's legal liability policy and the renewal application as trial exhibits. Hormel had no objection and the exhibits were identified in the Final Pretrial Order as "category A" exhibits. That is, the parties agreed that the exhibits would be offered and admitted without objection. Pursuant to the parties' agreement and the Final Pretrial Order, the exhibits will be received. The motion *in limine* is denied.

### F. Opinions of Kathleen Kotula

After the flood waters receded, Hormel retained Jack Garvin, the owner and president of an inventory, salvage, and appraisal service, to document the extent of Hormel's loss. Garvin also oversaw the disposal of the products on Hormel's behalf. Hormel intends to call Jack Garvin to testify as a fact witness regarding the amount of the damaged products.

Hormel also designated Mr. Garvin as an expert witness for a limited purpose. If Crystal is allowed to offer testimony regarding the alleged salvage value of the damaged products, then Garvin would testify in response. As part of that testimony, Garvin would testify regarding opinions expressed to him by Dr. Kathleen Kotula. Specifically, Kotula told Garvin that she was concerned about e-coli and botulism which could be found on the exterior of the canned hams, but could be "communicated to the ham when it was opened."

As set forth earlier in this ruling, the Court has concluded that Crystal will not be permitted to offer any testimony regarding the purported salvage value of the damaged food products. At the time of hearing, Hormel's counsel conceded that if Crystal is not permitted to offer evidence regarding alleged salvage value, then it will not be necessary to call Garvin as a rebuttal expert. Accordingly, this motion will be denied as moot.

## G. Lost Profits

Next, Crystal asks that Hormel be prohibited from offering any evidence regarding alleged lost profits. Hormel asserts that its damages are measured by the wholesale value of the products when they were ruined in the flood. Crystal argues that Hormel's recovery, if any, is limited to its cost of production.

In support of its argument, Crystal cites provisions found in the warehouse receipts, which prohibit recovery of consequential damages. As discussed above, section 9(d) of the warehouse receipts purports to place a limitation on Crystal's liability. Section 9(e) of the warehouse receipt provides as follows:

> The limitation of liability referred to in Section 9(d) shall be STORER'S exclusive remedy against COMPANY for any claim or cause of action whatsoever relating to loss, damage and/or destruction of goods and shall apply to all claims including inventory shortage and mysterious disappearance claims unless STORER provides by alternative evidence that COMPANY converted the goods to its own use. STORER waives any rights to rely upon any presumption of conversion imposed by law. In no event shall STORER be entitled to incidental, special, punitive, or consequential damages.

Warehouse Receipt (Crystal's Trial Exhibit 2004), § 9(e) at 2. (In other versions of the warehouse receipt, the clause set forth above is found in section 9(f). *See, e.g.*, Crystal's Trial Exhibit 2005.)

The Court has previously determined that because it conflicts with paragraph 12 of the Warehouse Agreement, section 9(d) of the warehouse receipts is ineffective. That is, paragraph 12 of the Warehouse Agreement requires Crystal to indemnify Hormel for all losses resulting from Crystal's negligence. The Court concludes that section 9(e) is ineffective for the same reason. The Warehouse Agreement provides that if there is a discrepancy between the Agreement and the warehouse receipts, "the terms and conditions of this Agreement shall control."

The law regarding recovery in this case is that governing breach of contract generally. "In Iowa, 'the measure of damages is the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented or the breach of it has entailed.'" *Optimal Interiors, LLC v. HON Co.*, 774 F. Supp. 2d 993, 1011 (S.D. Iowa 2011) (quoting *DeWaay v. Muhr*, 160 N.W.2d 454, 458 (Iowa 1968)). In other words, "compensatory damages are designed to put the injured party in as good a position as he would have had if performance had been rendered as promised." *Id.* If the loss to Hormel's products was caused by Crystal's breach of contract, then the Court believes that Hormel is entitled to be placed in the same position it would have been if Crystal had not breached. In this case, that means that Hormel could have sold the products and received their wholesale value. The "lost profits" – the difference between the products' wholesale value and their cost of production – are recoverable notwithstanding the provisions of the warehouse receipts. The motion will be denied.

## H. Articles Authored By Crystal's Attorney

One of Crystal's attorneys, John F. Horvath, has authored a number of articles pertaining to legal issues in the refrigerated warehouse industry, which were published in a bulletin of the International Association of Refrigerated Warehouses. Crystal asks that Hormel be prohibited from introducing any articles authored by Horvath. Hormel asserts that the documents "are highly relevant to Crystal's position that Crystal's unilateral and unexecuted IARW form warehouse receipt, as opposed to the Agreement, is controlling."[20] The Court disagrees. As set forth above, the Court has concluded that any terms or conditions of the warehouse receipts which purport to limit the amount of loss claimed by Hormel resulting from Crystal's negligence are ineffective. Furthermore, the probative value of the articles, if any, is substantially outweighed by a danger of unfair prejudice, confusion of the issues, or misleading the jury. FED. R. EVID. 403. The Court concludes that the articles are inadmissible.

---

[20] Hormel's Response (docket number 105) at 1.

## I. Insurers' Right to Subrogation

In its ninth motion *in limine*, Crystal asks that Hormel be prohibited from offering any evidence regarding its obligation to "refund" any amounts to its insurers. Crystal bases its argument on the premise that Hormel lacks constitutional jurisdictional standing to assert any claim for reimbursed losses. This argument was previously raised in Crystal's motion to dismiss, and has been previously rejected by the Court. *See* docket number 73. For the reasons previously stated, the Court concludes that Hormel has standing to seek recovery for reimbursed losses.

## J. Alleged Temperature Abuse

Finally, Crystal asks that Hormel be prohibited from offering any evidence regarding "alleged temperature abuse damages to its goods." Appendix C to the Warehouse Agreement required the products to be stored at 35 degrees Fahrenheit. During the flood, the refrigeration equipment apparently did not work for approximately 24 hours, and the temperature in the warehouse rose to 45-50 degrees. In arguing that Hormel should be prohibited from offering any evidence in this regard, Crystal notes that Hormel did not separately allege breach of contract for failing to store the products at or below 35 degrees, nor did Hormel conduct any testing to determine whether the increased temperature damaged the products. In its response, Hormel asserts that its complaint meets the pleading requirements of FEDERAL RULE OF CIVIL PROCEDURE 8(a) and that product testing is not required to establish temperature abuse.

The Court agrees with Hormel. The complaint fairly places Crystal on notice of the nature of Hormel's claim. Crystal clearly understood that Hormel is asserting that Crystal breached the warehouse agreement, including the requirement that the products be stored at 35 degrees. Furthermore, while product testing – or the lack thereof – may be relevant to the issue of whether Hormel has proved it suffered damages as a result of Crystal's breach, the Court does not believe that it is a prerequisite to recovery. Accordingly, this motion will be denied.

## V. ORDER

For the reasons set forth above, the Motions in Limine filed by the parties (docket numbers 78, 79, 80, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, and 92) are **GRANTED** in part and **DENIED** in part, as set forth above.

DATED this ___3rd___ day of April, 2012.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA